865 F.2d 1267
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Elinor BROWN, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant-Appellee.
 No. 87-1964.
 United States Court of Appeals, Sixth Circuit.
 Jan. 9, 1989.
 
 Before KEITH, NATHANIEL R. JONES and MILBURN, Circuit Judges.
 PER CURIAM:
 
 
 1
 Plaintiff, Elinor Brown ("Brown"), appeals from the order of the district court affirming the final decision of defendant, Secretary of Health and Human Services ("Secretary"), that Brown was not disabled because she retained the residual functional capacity to perform her past work, and, therefore, was not entitled to receive disability insurance benefits. Upon review, we AFFIRM.
 
 
 2
 Brown was fifty-one years old when she applied for disability insurance benefits on November 5, 1985. From 1965 until March 1985, when she ceased working because of pain and limitations in her neck, back and hip, Brown was employed as a waitress. To perform this job, Brown was required to walk or stand throughout her workday; to bend frequently; to lift as much as fifty pounds; to prepare food; to operate the cash register; to order supplies and pay bills; and to open and close the restaurant.
 
 
 3
 On May 20, 1985, after she stopped working, Brown was examined by a Dr. Sultzman, to whom she complained of her back pain for the last thirty years; and of tenderness over the sacroilliac joint and on her right side near her lumbrosacral joint. Brown reported that the pain radiated into her right thigh; however, Dr. Sultzman's tests revealed no objective indication of the pain, such as tingling or numbness. Dr. Sultzman noted a seven-eighths inch disparity in the length of her legs, with an accompanying pelvic tilt to the right. Bilateral straight leg raising was painless between sixty-five and seventy degrees and reflexes were present and equal. Dr. Sultzman concluded that Brown suffered from lumbar degenerative disc disease; scoliosis; limb length discrepancy; sacroilliac arthralgia; and osteoprosis.
 
 
 4
 Brown saw Dr. Sultzman again on June 10, 1985, when she complained of mid-thoracic pain occuring particularly during lateral bending and forced rotation. Dr. Sultzman noted, however, improvement in Brown's spinal difficulties, and advised her to continue taking a calcium supplement and anti-inflammatory medicine in addition to light exercise.
 
 
 5
 During Brown's next appointment with Dr. Sultzman on July 22, 1985, Brown told him that she felt much better and that she was anxious to resume working. Straight leg raising was ninety degrees without pain. Brown demonstrated no neurological deficits or lower lumbar area tenderness. Following his examination, Dr. Sultzman advised Brown to resume working.
 
 
 6
 On September 10, 1985, Brown again saw Dr. Sultzman, complaining of neck pain and stiffness in addition to tingling in her left arm and hand. Brown noted no significant pain in her lower back; however, she stated that she felt weak, listless and unable to work. Despite these complaints, Dr. Sultzman found no neurological deficits. Straight leg raising was painless to ninety degrees. Although rotation and right lateral bending of her neck was somewhat limited, Dr. Sultzman noted that, otherwise, Brown had full range of motion in her neck and lower back. Cervical spine x-rays showed no disc degeneration or hypertrophic spurring. Dr. Sultzman recommended, as part of her rehabilitation, that Brown resume working as soon as possible.
 
 
 7
 Brown's penultimate visit to Dr. Sultzman occurred on October 29, 1985. Her complaints of pain were similar to those reported during her previous visit. Dr. Sultzman took x-rays of Brown's lumbar spine which revealed a well-formed vacuum disc at L4-L5 and narrowing at L5-S1, with degenerative and osteoarthritic changes throughout.
 
 
 8
 The next doctor to examine Brown was Dr. Gunkle, at the request of her attorney. Dr. Gunkle observed a scoliosis, a pelvic tilt and a slight restriction of lateral bending. However, Brown as able to bring her fingertips within eight inches of her toes; had a negative Trendeleburg test;[1] a negative sciatic notch punch; no reflect deficits; good muscle function without atrophy or atony; and straight leg raising within normal limits. Dr. Gunkle's diagnosis was of advanced lumbar scoliosis accompanied by degenerative arthritic changes and disc space narrowing at L4-L5 and L5-S1. He further stated that, in his view, Brown was unable to resume her work as a waitress.
 
 
 9
 Brown last saw Dr. Sultzman on December 3, 1985. Dr. Sultzman summarized the results of that examination in a report dated January 14, 1986 which he completed for the Michigan Disability Determination Service. Dr. Sultzman noted that, although Brown still complained of lower back pain, anti-inflammatory medicine had improved her condition. Dr. Sultzman indicated that Brown wear a lumbosacral brace garment, and that her medication and back exercises should continue.
 
 
 10
 During her hearing before the administrative law judge ("ALJ") on April 22, 1986, Brown testified that she had difficulty sitting, standing and sleeping; that she could not crouch enough to vacuum; that she could not move furniture or carry heavy groceries; that she experienced pain in her neck which radiated down her back into her right hip which made it necessary to lie down two or three times a day; but that she could hand-scrub floors while wearing her back brace with only transient discomfort.
 
 
 11
 A vocational expert also testified at the hearing. He classified Brown's past waitressing work as semi-skilled and requiring a medium level of exertion. He further testified that (1) among Brown's transferable skills were food preparation, public contact, operation of cash register, handling money and restaurant supervision; (2) that Brown's skill at operating a cash register was transferable to sedentary work; and that (3) approximately 1,300 sedentary cashier jobs with a sit/stand option existed in the metropolitan area, and approximately 2,000 such jobs existed statewide.
 
 
 12
 The ALJ issued a decision on June 13, 1986 finding Brown disabled. The Appeals Council notified Brown on July 18, 1986 that it intended to review the ALJ's decision. On December 1, 1986, the Appeals Council found that Brown was not disabled, and this decision became the final decision of the Secretary.
 
 
 13
 The Secretary followed the five-step sequential evaluation process to determine disability which is provided for by 20 C.F.R. Sec. 404.1520 (a-f) (1987). At step four, which asks if the claimant's impairment prevented the performance of her past work, the Secretary concluded that, because Brown could perform light work, and because the job of waitress is a light exertional job, Brown retained the residual functional capacity to perform her past work. Brown filed a complaint for judicial review of this decision pursuant to 42 U.S.C. Sec. 405(g). The case was referred to a magistrate who recommended that summary judgment be entered in favor of the Secretary because substantial evidence supported the Secretary's decision. The district court agreed and entered judgment for the Secretary.
 
 
 14
 Upon review, we agree with the district court's conclusion that substantial evidence supports the decision of the Secretary. Despite the fact that Brown has a severe combination of impairments, the objective medical tests are consistent in their failure to show that any anatomical or musculoskeletal impairments are significant enough to rise to a disabling level which would prevent Brown from doing light work.
 
 
 15
 Similarly, concerning Brown's complaints of pain, there is substantial evidence that the objective medical evidence does not confirm the existence of disabling pain, nor does it indicate a condition of such severity that could reasonably be expected to give rise to the alleged pain. See Shavers v. Secretary of Health and Human Services, 839 F.2d 232, 235 (6th Cir.1987).
 
 
 16
 Accordingly, the judgment is AFFIRMED.
 
 
 
 [1]
 Stedman's Medical Dictionary defines a Trendelenberg test as "a test of the valves of the leg veins; the leg is raised above the level of the heart until the veins are empty and is then rapidly lowered; in varicosity and incompetence of the valves the veins will at once become distended."